**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| TYLER HOOPER , | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:12 CV 2 JAR / DDN |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Tyler Hooper for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of the Act, § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the decision of the Administrative Law Judge (ALJ) be affirmed.

**I. BACKGROUND**

Plaintiff Tyler Hooper, who was born on October 26, 1990, filed applications for Title II and Title XVI benefits on June 22, 2009. (Tr. 122-27.) He alleged an onset date of disability of January 1, 2009, due to a broken back and leg, arthritis, social phobia, depression, and anxiety. (Tr. 154.) Plaintiff's applications were denied initially on November 24, 2009, and he requested a hearing before an ALJ. (Tr. 75-79, 116.)

On October 21, 2011, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 13-26.) On December 13, 2011, the Appeals Council denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner. (Tr. 1-3.)

## II. MEDICAL HISTORY

Plaintiff sought psychological treatment at the Arthur Center five times between April 29, 2007 and June 24, 2008 from John Hall, M.D. Dr. Hall diagnosed anxiety disorder, major depressive disorder (recurrent, severe with no psychotic features), and bipolar II disorder. (Tr. 300-04.)

On May 8, 2007, plaintiff saw Dale Zimmerman, D.O., for anger issues and depression. Plaintiff stated that Cymbalta[1] made him drowsy during the day and kept him up at night. Dr. Zimmerman's impression was anxiety, depression, and sleep disturbance. (Tr. 364-65.)

On November 21, 2007, plaintiff underwent X-rays of his right foot because of pain due to a motorcycle accident. Three views showed no fracture, dislocation, or radiopaque foreign body, and no osseous abnormality. (Tr. 269-71.)

On November 26, 2007, plaintiff underwent a physical and psychological evaluation at the Arthur Center. Plaintiff was noted to have anxiety problems and problems with schoolwork. He enjoyed hunting, fishing, and other outdoor activities. He had a history of cocaine abuse but had been clean for over a year. His father has been incarcerated for methamphetamine manufacturing, and plaintiff had not spoken to him in about a year. He was not depressed, and stated "I don't feel there's anything to be depressed about." He had mild asthma. When asked what the three most stressful things in his life were, plaintiff mentioned his past drug abuse, but beyond that, "nothing at present." (Tr. 305-17.)

On December 3, 2007, plaintiff saw Dr. Zimmerman again for pain all over but specifically in his lower back. (Tr. 347-48.)

On April 8, 2008, plaintiff accidentally shot himself in the lower left leg and fractured his fibula. Caleb Vosburg, M.D., treated and cleaned the wound, and sent plaintiff home in a medical boot to wear for support, and gave him antibiotics to treat any infection and Percocet for pain. Kenneth Rall, M.D., X-rayed the injury the same day. Plaintiff was instructed to return for a follow-up exam. (Tr. 246-55.)

On April 9, 2009, plaintiff returned for a follow-up exam. X-rays showed minimally displaced fracture of the proximal fibular shaft with a foreign body present. Michael Allen Hood,

---

[1] Cymbalta is used to treat depression and generalized anxiety disorder. WebMD, http://www.webmd.com/drugs (last visited on October 16, 2012).

M.D., instructed plaintiff to continue in the boot and to place on the boot as much weight as he could tolerate. He instructed plaintiff to return two weeks later. (Tr. 244-45.)

On April 23, 2008, John Thomas Anderson, M.D., informed plaintiff that he could have the bullet removed and that he could take off the boot when not walking. Dr. Hood removed the bullet on April 28, 2008. (Tr. 231-33, 238-39.)

On May 20, 2008, plaintiff saw Dr. Zimmerman for stiffness in his shoulders, back, and knees. Dr. Zimmerman's impression was that plaintiff was stable but had chronic joint stiffness, and he recommended exercise and a diet lower in fat. Plaintiff saw Dr. Zimmerman again on July 8, 2008, and received the same report and treatment plan. (Tr. 339-40.)

On July 21, 2008, plaintiff underwent an X-ray of the right knee because of pain due to another motorcycle accident. Neal Richard Meyer, M.D., found mild joint effusion, but no acute osseous abnormality. (Tr. 259-62.)

On November 3, 2008, Andrea Earlywine, APN, conducted a psychological assessment of plaintiff. Plaintiff had had anxiety as long as he could remember, and always felt people were talking about him or judging him. He liked to watch television with friends and enjoyed hunting and fishing. Each day he drank 4 or 5 glasses of tea and one Mountain Dew. He had difficulty sleeping. She diagnosed plaintiff with general anxiety disorder, major depressive disorder, and a history of cocaine abuse prior to 2007. Ms. Earlywine diagnosed social anxiety disorder and gave plaintiff a GAF score of 50. [2] (Tr. 299.)

On December 8, 2008, plaintiff saw Ms. Earlywine again. Plaintiff reported that his anxiety may be getting worse. He was attending school but he did not like to be around people at all. He

---

[2] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.

On the Global Assessment of Functioning scale, a score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV) 32–34 (4th ed.2000).

was maintaining grades of "C" and above. Ms. Earlywine gave plaintiff a GAF score of 56.[3] (Tr. 298.)

On January 21, 2009, Ms. Earlywine, saw plaintiff again. She repeated her diagnoses. Ms. Earlywine gave him a GAF score of 55. Plaintiff reported that schoolwork was "really [his] only stress", but that he is intermittently depressed and his anxiety is worsening. He was becoming more isolated, and is prone to panic attacks particularly at school and at Wal-Mart. Ms. Earlywine continued his plan of Paxil, Trazodone, Neurontin, and Buspar.[4] (Tr. 297.)

On March 4, 2009, plaintiff saw Bradford Noble, D.O., for low back pain. Plaintiff said that this pain had been present for five years, and described the pain as "aching, sharp, and shooting." Plaintiff rated the pain an eight out of ten. He was involved in a SeaDoo accident in 2003 and suffered a gunshot wound to the leg in April 2008. He was scheduled for X-rays. (Tr. 421-23.)

On March 26, 2009, plaintiff's X-rays revealed anterior wedging of the L1 vertebral body. Dr. Noble ordered an MRI and suggested a steroid injection. He also wrote plaintiff a prescription for Tramadol.[5] (Tr. 419-20.)

On April 3, 2009, plaintiff received a steroid injection and an MRI of his lumbar spine. The MRI revealed minimal anterior wedging at L1, minimal degenerative changes in the disk space at L5-S1, but "[n]o acute disk herniation or central stenosis." The overall impression was that "no acute abnormalities are present." (Tr. 403, 424-25.)

On April 15, 2009, Dr. Noble prescribed physical therapy. Plaintiff also complained of erectile difficulties, which Dr. Noble speculated was due to the Tramadol. He administered a second lumbar epidural steroid injection, but did not make any further plan except for plaintiff to go to physical therapy, and said he would see plaintiff on an "as-needed basis." Plaintiff's discharge

---

[3] On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or coworkers). DSM–IV at 32–34.

[4] Paxil treats depression, general anxiety disorder, and panic disorder. Trazodone also treats depression. Neurontin is used to help control neuropathic pain. Buspar is used to treat anxiety. WebMD, http://www.webmd.com/drugs (last visited on October 16, 2012).

[5] Tramadol is used to relieve moderate to moderately severe pain. WebMD, http://www.webmd.com/drugs (last visited on October 16, 2012).

instructions allowed for return to normal activities the following day. By May 14, 2009, plaintiff had not scheduled an appointment. (Tr. 402, 407, 417.)

Plaintiff underwent another epidural steroid injection on June 10, 2009. Plaintiff's discharge instructions allowed for return to normal activities the following day. (Tr. 401, 406.)

On July 7, 2009, Dr. Noble administered to plaintiff a left L3 and L4 medial branch blockade and left L5 dorsal ramus blockade. This procedure was intended to mute the pain sensors where plaintiff was experiencing pain in his back. His discharge instructions again allowed for return to normal activities the following day. (Tr. 400, 404, 483.)

On September 14, 2009, plaintiff again saw Dr. Noble for a follow-up. Plaintiff estimated 50% improvement in pain. Plaintiff also stated that his pain that day was a 9 out of 10, though Dr. Noble noted, "He seems much more comfortable than 9 out of 10 in general terms with regard to his pain." (Tr. 437.)

On November 12, 2009, plaintiff saw Patrick Finder, MS, LP, for a psychological examination on behalf of the Missouri state Disability Determinations office. His assessment was based on his interview with plaintiff as well as documents forwarded to him from Disability Determinations. Mr. Finder noted Ms. Earlywine's diagnoses of anxiety, chronic joint pain, asthma, bilateral astigmatism, history of seizures, renal malformation, allergies, and major depressive disorder. Plaintiff told Mr. Finder of his SeaDoo accident, his gunshot wound in the calf from an accidental discharge of a hunting rifle that still causes him significant pain, and a series of accidents on four wheelers. Plaintiff stated that he has a broken back and degenerative bone disease. He cannot stand for long periods of time and can only engage in limited physical activity. (Tr. 446-53.)

Plaintiff explained that he gets nervous and finds it difficult to sit still or talk; prior to being seen at the Arthur Center, he "was almost homebound because he could not get out of his house due to the anxiety." Plaintiff reports going to the Arthur Center for mental health treatment with Dr. Hall as early as 2004 or 2005. However, psychologist Finder noted that the medical records showed that plaintiff saw Dr. Hall in 2008. Plaintiff also reported post-traumatic stress symptoms related to sexual abuse he experienced as a child and obsessive-compulsive behavior. He felt compelled to always wear a particular baseball cap and to kick the refrigerator door after closing it. He was able

to gauge abstract thinking, and was able to spell "world" backwards, though it required several tries. (Id.)

Plaintiff reported that he started smoking marijuana when he was about fourteen and shortly afterward he was consuming alcohol and then crack cocaine. He was sent to a juvenile detention center for forgery after taking another person's checks and trying to cash them. From there, he was sent to Camp Avery, the Missouri state Division of Youth Service facility in Troy, Missouri. At Camp Avery, authorities decided it was best to treat plaintiff's substance abuse, and sent him to an inpatient treatment facility in Kirksville, Missouri. He was out of his house approximately eight months, and attributes his recovery from drug abuse and renewed investment in his schoolwork to this period. (Id.)

Mr. Finder's diagnostic impressions were generalized anxiety disorder, panic disorder with agoraphobia, obsessive-compulsive disorder, dysthymic disorder, and cocaine abuse in full sustained remission. Physically, Mr. Finder found a non-aligned healing of plaintiff's back, arthritis in the knees, history of concussion and seizures, and obesity. He gave plaintiff a GAF score of 50. (Id.)

Plaintiff underwent a psychiatric review technique from Glen D. Frisch, M.D., on November 24, 2009. Dr. Frisch found plaintiff's difficulties in social functioning and maintaining concentration, persistence, or pace both to be "moderate." Plaintiff's restriction of daily living activities was "mild," and he had no repeated episodes of decompensation. She determined that plaintiff did not meet anxiety-related criteria of the Social Security disability listings but concurred with Mr. Finder with respect to plaintiff's diagnoses. (Tr. 454-65.)

The same day, plaintiff also underwent a physical and mental residual functional capacity assessment. His understanding and memory were not significantly limited. His concentration and persistence were moderately limited only in his ability to carry out detailed instructions, maintain attention for extended periods, and interact appropriately with others. No category was "markedly limited." Dr. Frisch concluded plaintiff "would perform most efficiently in a work environment requiring minimal contact with the general public and co-workers." (Tr. 466-68.)

The physical RFC assessment determined that plaintiff has a normal gait and strength, and very few physical limitations, despite his obesity. Plaintiff alleged difficulty lifting, squatting, standing, sitting, kneeling, stair climbing, and walking even 15 to 25 feet. Dr. Frisch wrote,

"Allegations of severity may have been credible for the first few weeks post back injury, but are not consistent with current MER or with noted abilities. Allegations are partially credible." (Tr. 469-74.)

On May 11, 2011, plaintiff saw psychologist Finder again, who noted that plaintiff had a noticeable body odor, was disheveled in dress and appearance, and appeared not to have shaved in a few days. Mr. Finder included a narrative much the same as his first assessment, but this time appeared to take plaintiff at his word that he had been treated for mental health issues since 2004. Plaintiff stated that his gunshot wound still aches "but it is not acute pain and it does not bother him a great deal," though his back pain was still severe. Plaintiff said he can walk only 100 yards before it begins to hurt. Plaintiff lives a quiet life with his mother and attends an alternative school. He is wholly dependent upon his mother; plaintiff tries to help her with household tasks, but can only do so in "limited episodes." In the past, he liked to hunt, fish, ride four-wheelers, and be on the water with his friends, but that he cannot do any of those things now due to his back and calf injuries. He also expressed difficulty concentrating, and reported symptoms of anxiety, posttraumatic stress, and obsessive compulsive disorder. He was becoming extremely socially isolated, and felt helpless and hopeless. Mr. Finder added to his diagnoses major depressive disorder (MDD), post-traumatic stress disorder (PTSD), and avoidant personality features. He again gave plaintiff a GAF score of 50. (Tr. 479-88.)

On May 17, 2011, plaintiff returned to the Arthur Center for psychological care. Plaintiff presented with anxiety, especially when in public, as well as symptoms of insomnia and trauma. Plaintiff had a girlfriend as of this consultation. Plaintiff reported that he had been employed power-washing buildings, cleaning up parks, and working in home health care. He reported that his chronic back pain kept him from doing very much housework. Ahsan Sayed, M.D., advised him of the limitations of a medication-only treatment for anxiety and recommended behavioral therapy to work on coping skills in addition to medication. (Tr. 495-501.)

On July 27, 2011, plaintiff saw Syed Imam, M.D., at the Arthur Center. Plaintiff reported that he had a fiancée. He presented with symptoms of depression, anxiety, and obsessive compulsive

disorder. He asked for a trial of controlled substances including Valium.[6] Dr. Imam advised plaintiff that counseling, not more medication, would be best for him. Plaintiff showed understanding. (Tr. 502-04.)

**Testimony at the Hearing**

On October 4, 2011, an ALJ conducted plaintiff's hearing. (Tr. 36-64.) Plaintiff testified he was 20 years old and single, and living with his mother in a house. He graduated high school through the Missouri Options Program. This program targets students at least one year behind their expected credit hours to graduate and allows them to continue schoolwork on an alternative schedule. They receive high school diplomas when they take the GED. He has difficulty walking, sitting, and lifting due to his back pain. His back pain is his only physical barrier to employment. He currently sees a nurse practitioner, Deborah Crawford. The last time Ms. Crawford instructed plaintiff not to do any heavy lifting was roughly a year and a half prior to the hearing. (Tr. 40-44.)

Plaintiff testified he wakes up every morning around 9:00 a.m., his mother makes him breakfast and he takes his medicine – Tramadol, Seroquel, and Wellbutrin. Tramadol and Seroquel make him lethargic. He then watches television for two hours, eats lunch with his brother, reads for a few minutes, and then takes a three-hour nap. He watches more television until dinner, eats dinner, and then goes into his room to think until he goes to sleep, which is usually around 10:00 p.m. (Tr. 44-47.)

Plaintiff can dress himself, but has difficulty showering and shaving regularly because he cannot stand long enough to get it all done. He does no grocery shopping, no laundry, dishes, or sweeping. He does not exercise beyond "daily activities," and he has no hobbies. (Tr. 47-48.)

Plaintiff suffers from general anxiety disorder, post-traumatic stress disorder, and depression. He has panic attacks twice weekly, which last from ten to ninety minutes. During these attacks, he struggles to breathe, and he becomes lightheaded and sick to his stomach. Psychologically, he feels barred from employment because of his inability to talk to people. He does not like to be around people. Prior to the hearing, he received treatment from the Arthur Center for about four months

---

[6] Valium is used to relieve anxiety, muscle spasms, and to control alcohol withdrawal. WebMD, http://www.webmd.com/drugs (last visited on October 16, 2012).

from psychiatrist Dr. Imam. He had also received treatment there from 2005 to 2009 from psychiatrist Dr. Hall. Plaintiff discontinued treatment because the waiting room caused him too much stress. (Tr. 48-51.)

Other than his mother and his brother, plaintiff does not see anyone else except his doctors. He belongs to no clubs or organizations. He does not have problems talking to the receptionists at the Arthur Center, but he tries not to speak to them. This has been the case since 2003.[7] (Tr. 51-52.)

Plaintiff has trouble concentrating. His pain is sharp and constant, and it intensifies with physical activity. In an eight-hour workday, he could spend three hours walking, ninety minutes standing, or sixty minutes sitting in a chair. (Tr. 53-54.)

Plaintiff has not used marijuana or cocaine since 2006. In 2006, he went into an inpatient rehabilitation facility for sixty days. He estimates that he stopped having friends in 2007, though he never had very many. (Tr. 55-56.)

In 2011, plaintiff worked part-time as an in-home attendant for nine months, which required him to wash dishes and cook light meals for an elderly lady that lived on his street. He was scheduled to work five shifts per week of one hour and forty-five minutes each (for a total of eight hours and forty-five minutes per week), but missed approximately three out of every ten shifts because he would get stressed out and couldn't stand to talk to anybody. He was eventually dismissed as a result. (Tr. 57-58.)

He also had problems attending class in the Missouri Options Program. He "just couldn't bring [himself] to go" because of the stress of all the students. He accrued approximately fifteen absences every month. He was eventually dismissed for his absences. (Tr. 58-59.)

Approximately three out of every seven days, the severity of his depression leaves him unable to leave his room for the entire day. He would not have attended the hearing if his mother hadn't brought him because of the stress of the setting. Attending the hearing without wearing his hat also caused him difficulty. However, he brought the hat with him, and stated that it kept people from seeing him. (Tr. 59-60.)

Randolph Sammons, a vocational expert (VE), testified at the hearing. Because plaintiff had

---

[7] The undersigned notes that plaintiff would have been 13 years old in 2003.

no past relevant work for the ALJ to consider, the ALJ asked the VE hypothetical questions regarding the exertional and skill levels for jobs in the national economy and the regional economy. (Tr. 61.)

The ALJ first described an individual who was 18 to 20 years old, with a high school education and no past relevant work. The hypothetical individual was limited to medium exertion, could not use ladders, ropes, or scaffolds, but could kneel, crouch, and crawl as needed, and use ramps and stairs. The individual should avoid exposure to vibration. The individual was limited to work with only routine changes, and with only occasional contact with the general public and coworkers. (Tr. 61.)

The VE stated that such an individual could work as an office clearer or custodian, which is unskilled and requires medium exertion. Over three million of these occupations exist in the national economy. Such an individual could also work as a warehouse worker, which is also unskilled and requires medium exertion. Over two million of these occupations exist in the national economy. The individual could also work as a kitchen worker, which is also unskilled and requires medium exertion. Roughly 522,000 positions exist in the national economy. (Tr. 61-62.)

When the ALJ adjusted the hypothetical question to allow for only light exertion but with the same limitations, the VE responded that the individual could work as a hotel cleaner, which has 1.5 million jobs in the national economy. The individual could also work as an assembler of small products, which has 309,000 positions in the national economy. (Tr. 62.)

The ALJ asked the VE if plaintiff would be employable assuming his testimony was "fully credible and supported by the evidence." The VE answered that he would be unemployable due to his absenteeism. In the national unskilled job market, employers generally will not tolerate more than two to three absences per month, and require the employee to be on task approximately 90 percent of the day. (Tr. 63.)

Plaintiff's counsel asked the VE about a hypothetical person who had no ability to work with co-workers, to deal with the public, to interact with supervisors, to function independently, to maintain person appearance, and to behave in an emotionally stable manner. The VE responded that such a person would be unemployable. (Tr. 64.)

## III. DECISION OF THE ALJ

On October 21, 2011, the ALJ issued a decision that plaintiff was not disabled. (Tr. 13-26.) At Step One of the prescribed regulatory decisionmaking scheme,[8] the ALJ determined that plaintiff was not engaged in substantial gainful activity since the alleged onset date. At Step Two, the ALJ determined that plaintiff had four severe impairments: anxiety-related disorders, depression, back pain, and obesity. (Tr. 15-16.)

At Step Three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). The ALJ noted that no physician ever mentioned findings equivalent in severity to the criteria of listed impairments, and the medical record does not suggest finding otherwise. Mental impairments must result in at least two of the following to satisfy the criteria of listings 12.04, 12.06, and 12.09: marked restriction of activities of daily living, marked difficulties maintaining social functioning; marked difficulties maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Plaintiff was only mildly limited in his daily activities, confirming a capacity for personal care tasks. Plaintiff has moderate difficulties in social functioning, though he had a girlfriend in May 2011. Plaintiff had moderate difficulties in concentration, persistence, or pace. He claimed difficulty with schoolwork, but told the consultative examiner that he was working hard and receiving good grades. The plaintiff had no episodes of decompensation of extended duration, and plaintiff did not allege anything to the contrary. (Tr. 16-17, 23.)

At Step Four, the ALJ determined that the plaintiff has the residual functional capacity (RFC) to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), though limited to simple tasks with routine changes and only occasional contact with the general public and coworkers.

At Step Five, the ALJ identified jobs in sufficient numbers in the national economy that fit plaintiff's RFC. (Tr. 17-25.)

The vocational expert testified that positions allowing for such accommodations exist in the national economy in significant numbers. His testimony was accepted, and therefore the ALJ found

---

[8] See below for a description of the required five-step regulatory decisionmaking framework.

that plaintiff's impairments would not preclude him from performing work in the national economy. Thus, plaintiff was not disabled.  (Tr. 25.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  20 C.F.R. §§ 404.1520(a)(4)(i)-(iii).   If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating he is no longer able to return to her PRW.  Pate-Fires, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, or, as here, had no PRW,  the burden

-12-

shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(5)(v).

## V.  DISCUSSION

Plaintiff argues the ALJ erred in the determination of his RFC.  Plaintiff argues that the ALJ (1) afforded too much weight to Dr. Frisch's opinion, and (2) afforded too little weight to the findings of psychologist Finder.

### A.  Dr. Frisch's Opinion

Plaintiff argues that the ALJ's decision to adopt the opinion of the non-examining state agency consultants over the opinion of an examining psychologist was reversible error.  "Where the medical evidence is equally balanced . . . the Administrative Law Judge resolves the conflict" with medical evidence, including that obtained from examining sources Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995). However, the ALJ determined that the medical evidence was not equally balanced.

The ALJ did not rely on Dr. Frisch's findings wholly and exclusively.  Rather, the ALJ afforded her opinion "significant weight."  (Tr. 24.)  Plaintiff argues this was error because 1) she did not examine plaintiff, and 2) because her evaluation took place in 2009, and cannot have encompassed the significant portion of the record that had not yet occurred.

Because of their expertise both in their medical field and Social Security disability evaluations, the ALJ must consider the findings of state agency consultants as opinion evidence.  20 C.F.R. § 404.1527(f)(2)(i).[9] Generally, the opinions of a non-examining source will be afforded less weight than those of examining sources.  Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010). However, the ALJ's decision must be based on the record as a whole, and the ALJ deemed Dr. Frisch's testimony consistent with the general record.  To find error in the acceptance of an opinion consistent with the record as a whole would be to find error in the entire record.  Moreover, the principle expressed in Wildman is a generalization, and not a rule.  See, e.g., Casey v. Astrue, 503

---

[9] An ALJ must still explain the weight given to these opinions as an ALJ must for any other medical opinion. 20 C.F.R. § 404.1527(e)(2)(ii).

F.3d 687, 694 (8th Cir. 2007) ("The ALJ did not err in considering the opinion of [the State agency medical consultant] along with the medical evidence as a whole."). Although Dr. Frisch's opinions were expressed in 2009, the ALJ's opinion cites medical evidence through September 2011, the month before the hearing took place, and nearly two years after Dr. Frisch's assessment.

A proper determination of a claimant's RFC requires an ALJ to consider at least some professional medical evidence. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). The ALJ considered evidence from a medical professional when he afforded Dr. Frisch's opinion significant weight but psychologist Finder's opinion no weight. As stated above, the ALJ must consider the opinions of state agency consultants precisely because they are medical professionals. The ALJ's decision lawfully afforded "significant weight" to Dr. Frisch's findings because it was "consistent with the record as a whole." (Tr. 24.) The RFC determination included evidence from Dr. Hall, Dr. Zimmerman, Nurse Earlywine, Dr. Noble, and Dr. Imam. Further, Social Security regulations "impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3rd Cir. 2011). The ALJ considered medical evidence beyond Dr. Frisch's opinion; therefore, plaintiff's argument regarding time lapse fails. Because Dr. Frisch's opinions were based upon and consistent with the record as a whole, the ALJ properly afforded her opinions significant weight.

**B. Psychologist Finder's Opinions**

Plaintiff also argues that the ALJ improperly dismissed the opinions of Mr. Finder. Plaintiff contends that the ALJ's reasons for granting no weight to his opinions include the fact that Mr. Finder's second evaluation was at the request of plaintiff's attorney and a statement that Mr. Finder did not support his findings with a narrative. Plaintiff argues that these reasons are respectively inconsequential and untrue.

The ALJ stated in his opinion, "While Mr. Finder did serve as the consultative examiner, return through referral from the attorney suggests an attempt to generate evidence in connection with this claim, not for treatment purposes. He was presumably paid for the report." (Tr. 24.) Plaintiff rightly takes issue with the comment regarding payment, as Dr. Frisch was presumably paid by the government.

> The Court does not believe that the fact that [a doctor] examined Plaintiff at Plaintiff's request should negatively influence the ALJ's decision, and the comment made by the ALJ that [the doctor]'s opinion was less than credible because [he] "was presumably paid for the report" casts aspersions on the integrity of [the doctor] as well as Plaintiff's attorney. The Court also presumes that the Commissioner paid the consultative examining physicians for the reports generated at his request as well.

Hicks v. Astrue, 2010 WL 2671387 at *8 (W.D. Ark. 2010). Were payment the only reason for discrediting Mr. Finder's opinions, the ALJ may have committed reversible error. This is not the case. Even assuming that the ALJ erroneously found that Dr. Finder's opinions lacked a narrative explanation,[10] substantial evidence supports the ALJ's findings.

Plaintiff failed to address the primary reasons the ALJ expressly discredited Mr. Finder's opinions. They included the facts that the opinions were based solely on plaintiff's subjective statements and that the evaluation took place after two years without treatment. As a preliminary matter, the opinion of a non-treating source such as Mr. Finder is not entitled to substantial weight. See C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Mr. Finder's opinions are inconsistent with much of the medical evidence in the record. For example, Mr. Finder felt that plaintiff had severe psychiatric limitations, though plaintiff had not undergone psychiatric treatment for over two years. (Tr. 297, 495.) While a lack of treatment does not necessarily imply a lack of need for treatment, in this case plaintiff had been in treatment consistently. He then ceased going to treatment, had a girlfriend as of 2011, and only sought treatment again well after disability proceedings began. (Tr. 495.) He had also stopped taking his psychotropic medication in the interim. (Tr. 446, 480.) These circumstances constitute substantial evidence supporting the ALJ's finding that plaintiff's psychiatric limitations were not as severe as Mr. Finder suggested. See Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on objective medical evidence.").

---

[10] Psychologist Finder's opinions are stated in three reports, one dated November 19, 2009 (Tr. 440-53), and two dated May 20, 2011. The first of the May 20, 2011 reports is comprised of 9 pages of findings and narrative discussion. The second of the May 20 reports is a 2-page summary form report, which Mr. Finder filled out. This form report appears to be what the ALJ's opinion refers to at Tr. 24. While this finding may be open to debate, psychologist Finder's handwritten statements are not much more than prose statements of his "x" marks on the form. (Tr. 490-91.) This supports the statement by the ALJ that Dr. Finder's form report lacks a narrative that explains his opinions.

Furthermore, Mr. Finder's report regarding plaintiff's physical limitations indicates that his conclusions are based entirely on plaintiff's subjective complaints, which are not consistent with the record. Mr. Finder discussed plaintiff's "broken back," though a lumbar spine X-ray from March 2009 revealed "no acute findings," and an MRI of his spine in April 2009 revealed "minimal anterior wedging . . . likely congenital" at L1, and "minimal degenerative changes" at L5-S1 with no disc herniation or central canal stenosis." (Tr. 21, 23, 425.) Plaintiff did not seek treatment for his back pain after September 2009, over two years before the ALJ's decision. (Tr. 23-24.) See, e.g., Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (failure to seek ongoing medical treatment considered a factor discounting credibility of assertions of disabling pain). The record contains substantial evidence that plaintiff exaggerated both his physical and psychological symptoms, and that Mr. Finder relied on these exaggerations. The Commissioner's regulations require more than subjective evidence; they require medical signs and laboratory findings expected to produce the symptoms of which plaintiff complains. 20 C.F.R. § 404.1529. No such findings support Mr. Finder's conclusions. Therefore, the ALJ did not err by discrediting his opinion.

The issue of whether or not Mr. Finder's medical assessment was accompanied by a narrative need not be reached, because the ALJ's conclusion that his opinions were based on plaintiff's subjective reports is dispositive.

For the foregoing reasons, the ALJ's RFC determination was based upon substantial evidence.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


                                            /S/   David D. Noce
                                    UNITED STATES MAGISTRATE JUDGE


**Signed on November 26, 2012.**